## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

IN RE:                                                    CASE NO. 20-00837-

TIDWELL BROS. CONSTRUCTION INC.,                          CHAPTER 11 CASE

                    Debtor.
_____/

### CENTENNIAL BANK'S OBJECTION/RESPONSE TO DEBTOR'S EMERGENCY MOTION TO USE CASH COLLATERAL OF CENTENNIAL BANK [D.E. 2]; EMERGENCY MOTION OF DEBTOR-IN-POSSESSION FOR AUTHORITY TO COMPENSATE OFFICER AFFILIATES [D.E. 17]

Centennial Bank ("Centennial"), pursuant to 11 U.S.C. §§ 363, 364, 506, 507(b) and 702, Federal Rules of Bankruptcy Procedure 4001 and 9014, files this Response in Opposition to Tidwell Bros. Construction, Inc.'s, the debtor, and debtor-in-possession ("Debtor" or "Tidwell Bros.") Emergency Motion to Use Cash Collateral of Centennial Bank (the "Motion"), and Emergency Motion of Debtor-in-Possession for Authority to Compensate Officer Affiliates, and in support thereof, states as follows:

## FACTUAL BACKGROUND

**A.  The Facts Pertinent to the Prepetition Factoring Relationship between the Debtor and Centennial.**

1.      Centennial is, amongst other things, in the business of providing factoring facilities and equipment loans. The factoring business involves, inter alia, the purchasing[1] of accounts

_____

1 Section 8 of the Factoring Agreement provides that the Factoring Agreement "will be governed by, construed and enforced according to the laws of the State of Arkansas." For the purpose of this pleading, the term 'purchasing' is intended to have the meaning given to this term by Arkansas' version of the Uniform Commercial Code ("UCC") and means "taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property." AR Code § 4-1-201(29).

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535  ·  (561) 338-3581

("**Accounts**")[2] from businesses ("**Factoring Clients**") with whom it has formed a contractual relationship, the terms of which are generally contained in invoices, as well as the contractual right to pursue collection, either prior to or after an event of default, of any accounts which serve as collateral securing the performance of all monetary and non-monetary duties and obligations of its Factoring Client.[3]

2.      Within the factoring industry, the entity that purchases Accounts is commonly referred to as the "**Factor**" or "**Purchaser**" of Accounts, in this case Centennial.   The entity from whom the Accounts are purchased is commonly referred to as the "Factoring Client" or "Seller," in this case Tidwell Bros. The Factoring Client's customer for whom the Seller has performed service(s) and/or sold good(s) and to whom an invoice is ordinarily issued to evidence the terms of sale and request payment is commonly referred to as the "**Customer**" or "**Account Debtor.**"[4]

3.      On or about August 9, 2017, Tidwell Bros. entered into an agreement titled "BusinessManager® Agreement with Businesses and Professionals (Variable Service Charge)," which was subsequently supplanted on October 9, 2018, by a second agreement titled "BusinessManager® Agreement with Businesses and Professionals (Variable Service Charge)" (the second agreement hereinafter referred to as, the "**Factoring Agreement**"). A true and correct copy of the Factoring Agreement is attached hereto as **Exhibit A**, but for any terms or provisions which are deemed confidential, which have been removed or redacted.

---

2 For the purpose of this pleading, the term 'Accounts' is intended to have the meaning given to this term by Arkansas' version of the UCC and means "a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold…, (ii) for services rendered." AR Code § 4-9-102(a)(2); *See* **Exhibit A**, § 1.1.

3 The Debtor's Motion indicates that the Debtor believes that the Factoring Agreement is akin to a merchant loan agreement for the purchase of future receivables. The Debtor does not inform how or why this characterization may benefit the Debtor, but nonetheless, the Debtor's characterization of Factoring Agreement as a merchant loan agreement is, based on a host of reasons, an incorrect one.

4 For the purpose of this response, the term 'Account Debtor' is intended to have the meaning given to this term by Arkansas' version of the UCC and means "a person obligated on an account." AR Code § 4-9-102(a)(3).

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535   ·   (561) 338-3581

4.      Anthony Tidwell executed the Factoring Agreement as the President of Tidwell Bros. and at such time and all relevant times was duly authorized to do so as agent and authorized representative on behalf of Tidwell Bros. James Tidwell executed the Factoring Agreement as the Vice President of Tidwell Bros. and at such time and all relevant times was duly authorized to do so as agent and authorized representative on behalf of Tidwell Bros.

5. Pursuant to the Factoring Agreement, Tidwell Bros. offered to sell, transfer and assign to Centennial Tidwell Bros.' fully earned Accounts, due to the delivery of goods or fully performed services, which Accounts Tidwell Bros. contractually represented and warranted at the time of each and every sale would qualify as eligible "bona fide" Accounts. *See* **Exhibit A**, § 5.1.

6.      In addition to acquiring and perfecting a first priority ownership interest in the Accounts Centennial purchased from Tidwell Bros. ("**Purchased Accounts**"), Centennial was also granted by Tidwell Bros. a first priority security interest[5] in various assets of Tidwell Bros. which were identified in the Factoring Agreement as Collateral, which collateral included, among other things, all of Tidwell Bros.' then owned or later acquired Accounts and proceeds thereof ("**Collateral**").

7.      On August 14, 2017, Centennial duly perfected its first priority ownership interest in the Purchased Accounts and its first priority security interest in the Collateral identified in the UCC-1 Financing Statement which Centennial achieved by having caused to be filed with the required filing office, the Florida Secured Transactions Registry, which was assigned filing number 20170214611X (the "**Financing Statement**"). A true and correct duplicate of the

---

5 For the purpose of this response, the term 'Security Interest' is intended to have the meaning given to this term by Arkansas' version of the UCC and means "an interest in personal property or fixtures which secures payment or performance of an obligation. "'Security interest'" includes any interest of a consignor and a buyer of accounts, chattel paper, a payment intangible, or a promissory note in a transaction that is subject to Chapter 9." AR Code § 4-1-201(35).

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535  ·  (561) 338-3581

Financing Statement is attached hereto as **Exhibit B**.

8.      In accordance with the Factoring Agreement, Tidwell Bros. offered for sale and Centennial purchased and was assigned the right to receive payment of the following invoices (i.e., Accounts) and in exchange Centennial made purchase price advances to Tidwell Bros. in exchange for purchasing the Purchase Accounts:

| Account Debtor | Invoice Number | Invoice Date | Invoice Amount | Amount Due6 |
|---|---|---|---|---|
| **Duke Energy** | 1711 | 12/24/2018 | $62,000.00 | $38,513.60 |
| | 1794 | 3/4/2019 | $97,000.00 | $80,607.68 |
| | 1853 | 3/29/2019 | $50,000.00 | $31,498.93 |
| | 1943 | 5/16/2019 | $61,456.89 | $61,456.89 |
| | 1944 | 5/17/2019 | $26,000.00 | $26,000.00 |
| | 1990 | 6/11/2019 | $63,456.89 | $63,456.89 |
| | 2112 | 9/12/2019 | $25,383.18 | $25,383.18 |
| | 2116 | 9/12/2019 | $2,875.08 | $2,176.12 |
| | 2119 | 9/12/2019 | $23,983.12 | $23,983.12 |
| | 2125 | 9/12/2019 | $12,481.92 | $12,481.92 |
| **Elite Construction** | 1742 | 1/24/2019 | $130,000.00 | $15,835.70 |
| | 1772 | 2/12/2019 | $115,000.00 | $115,000.00 |
| | 1799 | 3/11/2019 | $13,480.11 | $13,480.11 |
| | 1814 | 3/14/2019 | $15,000.00 | $15,000.00 |
| | 1857 | 4/3/2019 | $65,000.00 | $38,314.19 |
| **Holcim (US) Inc.** | 1899 | 4/23/2019 | $76,852.36 | $70,046.93 |
| **Northstar Demolition** | 2111 | 8/27/2019 | $34,675.00 | $31,025.00 |
| | | | **TOTAL AMOUNT DUE:** | **$664,260.26** |

(collectively, the **Matured Unpaid Invoices**").

9.      Pursuant to the Factoring Agreement, and as authorized by the Uniform Commercial Code § 9-406, Centennial issued a notification of assignment to each of the above-stated Account Debtors, giving notice that Tidwell Bros. assigned to Centennial the right to

---

6 The difference in the amount of Invoice Amount and Amount Due reflects a partial payment received by Centennial from the Account Debtor on an invoice.

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535   ·   (561) 338-3581

receive payment for all Accounts, and any Accounts were payable to Centennial in order for the Account Debtor to discharge its obligation on the Accounts.

10.    Centennial's Notice of Assignments that were issued are and remain at all times in full force and effect.

11.    The Factoring Agreement reads, in relevant part, that:

Nothing in this Agreement authorizes [the Debtor] nor may [the Debtor] seek to collect Purchased Accounts sold to [Centennial]. If [the Debtor] receives payment on any Purchased Account (or any Accounts upon an Event of Default), it will receive those payments in trust for [Centennial] and will remit such payments, if made by Negotiable Instrument, in kind, to [Centennial]; or, if made electronically, will remit an amount equal to the amount of all funds received, both of which shall be completed by no later than the next business day. *See* **Exhibit A**, § 2.5.4.

12.    Accordingly, pursuant to the Factoring Agreement, Tidwell Bros. represented and warranted to Centennial, that, at all times, all Accounts, whether or not purchased by Centennial, will be paid by the Account Debtors directly to Centennial, and if Tidwell Bros. were to receive any payment from any Account Debtor of any Account, then Tidwell Bros. would hold such payment in trust, and immediately remit such payment to Centennial, and Tidwell Bros. further agreed not to interfere with Centennial's rights in such Accounts. *See* **Exhibit A**, § 2.5.4.

13.    After one or more of the Unpaid Matured Invoices became past due and delinquent based on the date of payment of invoice terms, Centennial made inquiries to Tidwell Bros. in order to inquire why the payments due on the Matured Unpaid Invoices were not being timely remitted to Centennial by the Debtor's customers.

14.    In response to Centennial's inquiries, Tidwell Bros. assured Centennial that the Matured Unpaid Invoices were legitimately due and owing and that the Debtor would see to it that payment would be remitted to Centennial in accordance with the invoice terms and the Factoring Agreement.

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535  ·  (561) 338-3581

15.    The Matured Unpaid Invoices become delinquent, and Centennial did not receive payment due on the Matured Unpaid Invoices from any Account Debtors.

16.    On or about December 17, 2019, Centennial's counsel issued demand letters to the four Account Debtors identified in Section 8 above, in order to demand payments due on the Matured Unpaid Invoices.

17.    Unbeknownst to Centennial, in respond to the demand letters, Centennial learned that months earlier in or about August or September 2019, the Debtor contacted customers, including Holcim and Duke Energy, in order to cause Holcim and Duke Energy to change the Payee of record from Centennial to Tidwell Bros. Construction Inc. so that all ACH payments due on any Accounts would be remitted directly to Tidwell Bros., which actions expressly violated Centennial's rights to receive payment due to the account debtors receipt of Centennial's Notice of Assignment and Tidwell Bros. breach of the Factoring Agreement.

18.    The individuals employed by Duke Energy and Holcim who received the request from Mr. Tidwell unfortunately honored Mr. Tidwell's request to the change the Payee information, and paid all sums due on Matured Unpaid Invoices directly to Tidwell Bros. Tidwell Bros. retained all payments made on the Purchased Accounts, and instead of forwarding the payments to Centennial, exercised wrongful dominion and control over and kept the payment.

19.    As a result, Tidwell Bros. was paid **twice** on the Matured Unpaid Invoices, **the first time** when it received Centennial's purchase price advances., and **the second time** when Tidwell Bros. wrongfully obtained payments made on the Matured Unpaid Invoice's directly from the Account Debtors, and failed to deliver the funds to Centennial.

20.    It also appears that Tidwell Bros. may have implemented a similar scheme to misdirect funds due on Centennial's Purchased Accounts from Elite Construction, and the Debtor

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535    ·    (561) 338-3581

received and absconded with payments made by Elite Construction due on the Unpaid Matured Invoices.

21.     Centennial believes that Tidwell Bros. received most, if not all, of the sums due on the Matured Unpaid Invoices totaling an astounding Six Hundred Sixty Four Two Hundred Sixty Dollars and 26/100 (**$664,260.26**), and the Debtor failed to segregate those amounts, and hold the payments in trust for Centennial, and failed to remit such payments to Centennial as required by the Factoring Agreement. *See* **Exhibit A**, § 2.5.4.

22.     Centennial does not believe that the Debtor's principals have any basis to dispute, or contest any of the facts stated above in respect to the misdirected payments.

23.     On January 17, 2020, Centennial's sought to ascertain the Debtor's ability to repay its obligations to Centennial as a result of the Debtor's material breaches of the Factoring Agreement. Centennial's counsel sent a request for information to the Debtor's principal, Anthony Tidwell, requesting:

> A.  A proposed budget identifying the Debtor's next 3 months anticipated cash flow and expenses and how much Tidwell proposes to spend and for what reasons and/or purposes, and
> B.  A complete list of each customer job that the Debtor currently has and a forecast of the amount that the Debtor expects to receive on each job including how much the Debtor anticipates that it will cost to complete each job so as to enable Centennial to evaluate the Debtor's ability to perform.

24.     The Debtor's principal refused to provide Centennial with any of the information requested, and Centennial has not received from the Debtor  copies of any customer purchase orders, invoices, a list of any critical vendors, the terms of sale between the Debtor and its customers, a status of work competed, and not yet completed on each project that the Debtor has contracted to provide work to its customers, etc.   Centennial has notified the Debtor's counsel that it would need this information in order to evaluate the viability of the Debtor's budget.

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535   ·   (561) 338-3581

**B.  Prepetition Equipment Loans Entered into Between the Debtor and Centennial.**

25.      In addition to the business Manager relationship, on or about October 24, 2018, Centennial, as lender, and Tidwell Bros., as borrower, entered into the first of three separate equipment loan agreements (the **"First Equipment Loan")** whereby Centennial agreed to make a term loan to Tidwell Bros. in the principal amount of $331,435.25 in order to fund Tidwell Bros.' purchase of heavy machinery, more specifically described as, a 2014 Sandvik QI441 Mobile Impact Crusher (the "**Impact Crusher**"), pursuant to the terms and conditions of the First Equipment Loan.

26.      On October 26, 2018, Centennial duly perfected its purchase money security interest in the Impact Crusher identified in the UCC-1 Financing Statement which Centennial achieved by having caused to be filed with the required filing office, the Florida Secured Transactions Registry, which was assigned filing number 20180687605X (the "**Impact Crusher Financing Statement**"). A true and correct duplicate of the Impact Crusher Financing Statement is attached hereto as **Exhibit C**.

27.      On or about December 14, 2018, Centennial, as lender, and Tidwell Bros., as borrower, entered into a separate loan agreement (the "**Second Equipment Loan**"), whereby Centennial agreed to make a term loan to Tidwell Bros. in the principal amount of $73,126.20 in order to fund Tidwell Bros.'s purchase of heavy machinery, more specifically described as, a 2007 Mack CTP713 (the "**Mack**"), pursuant to the terms and conditions of the written agreement between the parties.

28.      On December 14, 2018, Centennial duly perfected its purchase money security interest in the Mack which Centennial achieved by having recorded a lien on the certificate of title

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535   ·   (561) 338-3581

to the equipment, as the lienholder holder of record. A true and correct duplicate of the lien information is attached hereto as **Exhibit D**.

29.     On or about January 15, 2019, Centennial, as lender, and Tidwell Bros., as borrower, entered into a   loan agreement (the "**Third Equipment Loan**"), whereby Centennial agreed to make a term loan to Tidwell Bros. in the principal amount of $100,155.70 in order to fund Tidwell Bros.' purchase of heavy machinery, more specifically described as, a Caterpillar 320 F L Hydraulic Excavator (the "**Excavator**"), pursuant to the terms and conditions of the written agreement between the parties.

30.     On January 18, 2019, Centennial duly perfected its purchase money security interest in the Excavator identified in the UCC-1 Financing Statement which Centennial achieved by having caused to be filed with the required filing office, the Florida Secured Transactions Registry, which was assigned filing number 201907497119 (the "**Excavator Financing Statement**"). A true and correct duplicate of the Impact Crusher Financing Statement is attached hereto as **Exhibit E**.

31.     The First Equipment Loan, Second Equipment Loan, and Third Equipment Loan is evidenced, secured, and memorialized by various agreements, notes and related loan documentation ("**Tidwell Equipment Loan Documentation**"), attached hereto as Composite **Exhibit F**.

32.     The Tidwell Equipment Loan Documentation were each executed by Tidwell Bros., through its authorized agents, A. Tidwell and J. Tidwell as a Director of Tidwell Bros., and at all relevant times, A. Tidwell and J. Tidwell were duly authorized to do so as agents and authorized representatives on behalf of Tidwell Bros.

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535   ·   (561) 338-3581

33.     Pursuant to the Tidwell Equipment Loan Documentation, Tidwell Bros. granted Centennial a purchase-money security interest in goods (i.e., the Impact Crusher, the Mack and the Excavator), which constitute purchase-money collateral securing Tidwell Bros. purchase money obligations to Centennial under the various loan agreements.

34.     On October 26, 2018, Centennial duly perfected its purchase money security interest in the Impact Crusher identified in the UCC-1 Financing Statement which Centennial achieved by having caused to be filed with the required filing office, the Florida Secured Transactions Registry, which was assigned filing number 20180687605X (the "**Impact Crusher Financing Statement**"). A true and correct duplicate of the Impact Crusher Financing Statement is attached hereto as **Exhibit C**.

35.     The Tidwell Equipment Loan Documentation provides:

CROSS-COLLATERALIZATION. In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of [Tidwell Bros.] to [Centennial], or any one or more of them, as well as all claims by [Centennial] against [Tidwell Bros.] or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether [Tidwell Bros.] may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

FUTURE ADVANCES. In addition to the Note, this Agreement secures all future advances made by [Centennial] to [Tidwell Bros.] regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

36.     The Debtor's prepetition Obligations arising under the Factoring Agreement and the indebtedness under the Tidwell Equipment Loan Documentation are fully secured by the Debtor's Collateral, including, but not limited to all cash collateral.

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535  ·  (561) 338-3581

37.    Centennial holds a secured claim against the Debtor in the total amount of
$698,692.67 as of the Petition Date, plus fees, charges, costs, and expenses, including attorney's
fees, as permitted by the parties' Factoring Agreement and Tidwell Equipment Loan
Documentation, and as permitted by the Bankruptcy Code § 506 ("**Centennial's Secured
Claim**").  Centennial's Secured Claim is broken down into the following amounts: unpaid
advances and fees due under the Factoring Agreement totaling the amount of $219,050.17, the
indebtedness due under the First Equipment Loan, Second Equipment Loans and Third Equipment
Loan in the amounts of $311,297.02, $77,420.70 and $90,924.78, respectively.

## MEMORANDUM OF LAW IN SUPPORT OF OBJECTIONS

### A.  Legal Standard Under 11 U.S.C. § 363 in Respect to Use of Cash Collateral and Adequate Protection of a Secured Creditors Interest in Cash Collateral.

The use of cash collateral is governed by Section 363 of the Bankruptcy Code, which reads
win relevant part, that:

(c) (2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of
this subsection unless—
(A)   each entity that has an interest in such cash collateral consents; or
(B)   the court, after notice and a hearing, authorizes such use, sale, or lease in
accordance with the provisions of this section.
(3)  Any hearing under paragraph (2)(B) of this subsection may be a preliminary
hearing or may be consolidated with a hearing under subsection (e) of this section,
but shall be scheduled in accordance with the needs of the debtor. If the hearing
under paragraph (2)(B) of this subsection is a preliminary hearing, the court may
authorize such use, sale, or lease **only if there is a reasonable likelihood that the
trustee will prevail at the final hearing under subsection (e) of this section.** The
court shall act promptly on any request for authorization under paragraph (2)(B) of
this subsection.
(4) Except as provided in paragraph (2) of this subsection, the trustee shall
segregate and account for any cash collateral in the trustee's possession, custody, or
control.
                        *          *          *
(e) Notwithstanding any other provision of this section, at any time, on request of
an entity that has an interest in property used, sold, or leased, or proposed to be
used, sold, or leased, by the trustee, the court, with or without a hearing, **shall**

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535  ·  (561) 338-3581

**prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.** This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

        \*        \*        \*

(p) In any hearing under this section—
(1) the trustee has the burden of proof on the issue of adequate protection; and
(2) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest.

(bolding supplied).

Section 363(c)(2) of the Bankruptcy Code provides that the court shall prohibit or condition use of cash collateral as is necessary to provide adequate protection for the creditor's interest in the collateral. "The purpose of providing 'adequate protection' is to insure that a secured creditor receives in value essentially what he bargained for." In re Sharon Steel Corp., 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993); In re Best Products Co., 149 B.R. 346, 348 (S.D. N.Y. 1992) (adequate protection payments protect a secured creditor against decline in value of collateral used by the estate). *In re Clinical Pet of Ocala, LLC*, No. 3:16-BK-4646-JAF, 2018 WL 1737210, at *3 (Bankr. M.D. Fla. Apr. 10, 2018).

A debtor's use of proceeds of the accounts (i.e. cash collateral) that serve as a secured creditors' collateral should be limited to the expenses that are "directly related to the operation, maintenance, or preservation of the" Debtor's operations. *See Putnal v. SunTrust Bank*, 489 B.R. 285, 291 (M.D. Ga. 2013); citing See *In re River Oaks Ltd. Partnership,* 166 B.R. at 99–100 E.D. (Mich. 1994).   The debtor bears the burden of proof that to establish that Centennial is given adequate protection of its interest in the Debtor's prepetition cash collateral. 11 U.S.C. § 363(p)(1); *See also Matter of Earth Lite, Inc.*, 9 B.R. 440, 444 (Bankr. M.D. Fla. 1981)(a debtor as a general proposition must demonstrate with convincing proof that the secured creditor is adequately protected"). "Clearly, however, the primary purpose of s 361 is to insulate the interest

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535  ·  (561) 338-3581

of a secured creditor in a debtor's property from diminution of value resulting from the delay in enforcing its rights occasioned by a debtor's need for time to work out its problems and reorganize its business under the protection of the automatic stay prescribed by 11 U.S.C. s 362. Thus, the purpose of adequate protection is not to protect the secured creditor from loss per se, but to maintain the status quo and prevent any additional loss due to delay after a debtor files its petition in this Court. *Matter of Karl A. Neise, Inc.*, 16 B.R. 600, 601 (Bankr. S.D. Fla. 1981); *citing In re Alyucan Interstate Corp.*, 12 B.R. 803, 808-809 (Bkrtcy.D.Utah 1981).

Bankruptcy Code § 363(e) is designed primarily to protect the collateral of secured creditors while debtor or a trustee continues to operate the business. *In re Allen Carpet Shops, Inc.*, 25 B.R. 595, 602 (Bankr. E.D.N.Y. 1982); citing 2 Collier on Bankruptcy 362–44 (15th ed. 1982) (interpreting 11 U.S.C. § 362(d)(1)) (internal citations omitted). The concept of adequate protection requires the Debtor to provide that its budget is viable and reasonable, and even then the Debtor is required to establish that the use of Centennial's cash collateral will result in a dollar-for-dollar adequate protection for the diminishment in Centennial's cash collateral. *See Desert Fire Protection v. Fontainebleau Las Vegas Holdings, LLC (In re Fontainebleau Las Vegas Holdings, LLC),* 434 B.R. 716, 727 (S.D.Fla.2010) (use of cash collateral requires dollar-for-dollar adequate protection in the form of new collateral).

## B. Adequate Protection of Centennial's Interest in Cash Collateral.

As detailed below, the Debtor's Motion does not satisfy its pleading burden (i.e., 11 U.S.C. § 363(p)(1)) to show that Centennial will receive adequate protection if the Debtor were permitted to use Centennial's cash collateral to pay expenses as provided in the Debtor's budget.7.

---

7 The Debtor's budget seeks approval to pay expenses totaling the amounts of $244,551 in March 2020, the amount of $300,642 in April 2020, and the amount of $486,192 in May 2020.

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535  ·  (561) 338-3581

This Court has approved adequate protection orders that contain provisions that condition a debtors use of cash collateral, including, among other things, prohibiting salary payments to the debtor's officers, granting replacement liens in post-petition assets to secured creditors, requiring debtors to make adequate protection payments to secured creditors for the use of cash collateral, and requiring debtors to provide weekly reporting on debtors operations and financial affairs. See *In re Clinical Pet of Ocala, LLC*, No. 3:16-BK-4646-JAF, 2018 WL 1737210, at *1 (Bankr. M.D. Fla. 2018).   Centennial requests that the Court require the debtor to provide weekly budgets and variance reports to Centennial and produce records to Centennial concerning the cash collateral in order to closely monitor the cash collateral and adequate protection, limit any authority for the Debtor to cash collateral only for expenses necessary to enable the Debtor to maintain operations and prevent the Debtor from diminishing Centennial's interest in its Cash Collateral, and grant Centennial adequate protection.

**Weekly budgets and variance reports, and documentation.**

This Court has entered adequate protection orders that require debtors to provide weekly collateral and operating reports and monthly operating reports reflecting the variances between the debtor's projected income and expenses, and cash flow, and the actual income and expenses, and cash flow. See *In re Clinical Pet of Ocala, LLC*, No. 3:16-BK-4646-JAF, 2018 WL 1737210, at *1 (Bankr. M.D. Fla. 2018). The Debtor's has not provided an accounts receivable aging report or any information that would enable Centennial, or the Court, to determine the value of the Debtor's cash collateral (i.e. accounts) as of the March 6, 2020, the Petition Date.   The Debtor's Motion merely states "The cash generated by the Debtor may constitute cash collateral within the meaning of §363(a) of the Bankruptcy Code (the "Cash Collateral")," but does not identify the value of the cash collateral.

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535  ·  (561) 338-3581

Any effort to fully evaluate the Debtor's ability to provide sufficient adequate protection to Centennial is likely futile until the Debtor provides information concerning the value of the Debtor's cash collateral. Centennial requests that if the Court is prepared to authorize the use of cash collateral that the Court direct the Debtor to furnish copies of all unpaid and outstanding invoices issued to the Debtor's customer as of the Petition Date, and a description of the project and purchase orders for which the invoices are issued, and copies of purchase orders and any agreements between the Debtor and its customers. The Debtor's has not filed a Schedules of Assets and Liabilities.

The Debtor's Motion does not appear to argue that an equity cushion exists in the cash collateral to protect Centennial's interest in cash collateral. To the contrary, according to the Debtor's 2019 profit and loss statement contained in the Debtor's Chapter 11 Case Management Summary [D.E.20] the Debtor had deficit cash balance in its bank accounts as of December 2019 totaling the amount -$21,418.18.

In addition, Centennial request that the Court directed the Debtor to deliver weekly budgets to Centennial's counsel containing information regarding the Debtor's business and financial condition on the Monday of each week until the final hearing commencing Monday, March 15, 2020, containing a variance report reflecting, on a line-item basis, the actual cash disbursements and revenues for the preceding month and the percentage variance (the "Variance Percent") of such actual disbursements and revenues from those reflected in the Budget for that period. Based on the information contained in the variance reports, Centennial has the right "to seek additional adequate protection in the event of a material adverse change in the facts and circumstances upon which this determination is based." *Matter of Karl A. Neise, Inc.*, 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981).

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535  ·  (561) 338-3581

**Limitations on the Use of Cash Collateral.**

Due to the dearth of information contained in the Debtor's budget, Centennial believes that the Court should deny the request to use cash collateral.   However, if the Court were to authorize the Debtor to use cash collateral, Centennial requests that the Court impose certain limitations in order to protect Centennial's interest in cash collateral, including denying the Debtor's request to pay salaries to the Debtor's three principal insiders.

The Debtor's budget contains a line item for salary payments to three insiders of the Debtor in the amount of $32,865 per month, or $394,380 per year. Centennial believes that the Debtor should not be permitted to use cash collateral to pay salaries of insiders prior to the final hearing on the Motion, and/or limitations on the insiders salaries should be imposed in order to preserve Centennial's interest in cash collateral pending a final hearing, especially due to the huge level of diversion of account proceeds as discussed above.

**Confirmation that the Debtor will not use cash collateral to pay prepetition claims.**

The Debtor should identify if the Debtor's budget is requesting the use of any cash collateral for payment of any claims of prepetition vendors, prepetition wages, or other expenses incurred prepetition, and/or confirm that the Debtor is only seeking to use cash collateral in order to pay new obligations arising post-petition in order to maintain the Debtor's operations, and to preserve Centennial's interest in cash collateral.

Centennial is particularly concerned that one or more of the Debtor's customers, including, Duke Energy, has asserted or may seek to assert a claim or defense of set off, recoupment or otherwise to payment of any prepetition or post-petition accounts, due to the Debtor's performance or non-performance of its duties.   Moreover, Centennial understands that the Debtor purchased goods, labor and/or materials from certain customers as part of its agreement with its customers,

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535   ·   (561) 338-3581

which may give rise to contra-accounts[8]. Any setoffs claimed by any customer, or any contra-account obligations would materially negatively impact the value of the Debtor's cash collateral. Accordingly, Centennial requests that the Debtor acknowledge that it does not possess any knowledge or notice of any claim for set off, recoupment, or otherwise, and no contra accounts exist that would materially negatively impact the value of the Debtor's cash collateral.

**Replacement liens and adequate protection payments.**

The Debtor has offered to grant a replacement lien to Centennial in all cash collateral acquired by the Debtor and arising after the Petition Date, and proposed to make a monthly adequate protection payment to Centennial in the amount of $3,000 per month.[9] However, Centennial has a Secured Claim in the amount of $698,692.67, plus fees, charges, costs, including attorney's fees as provided under the parties Factoring Agreement and equipment loan agreements.

The Debtor's cash flow budget projects that the Debtor will earn between April 1 through May 2020, a positive net cash flow in the amount of approximately $776,922 (i.e. cash flow after payment of all the Debtor's expenses). Centennial believes that the Debtor should be able to offer to pay Centennial adequate protection payments for the use of Centennial's cash collateral in a greater amount than the $3,000 monthly based on the Debtor's budget. There is no justification to shift the risk of success or failure from the Debtor to Centennial.  *In re Harbour E. Dev., Ltd.*, No. 10-20733-BKC-AJC, 2011 WL 6097063, at *4 (Bankr. S.D. Fla. Dec. 6, 2011).

---

8 A contra means a balance due on an account that is opposite of the normal balance for that account classification (e.g., an allowance for doubtful accounts). The use of a contra account would reflect the original amount due on the account, and any reduction to reflect the net amount due on the account.

9 Centennial wishes to confirm that the Debtor's offer to make adequate protection payments to Centennial in the amount of $3,000 per month was only intended to provide part of the adequate protection offered for the Debtor's use of cash collateral, and not intended to also serve as adequate protection for the Debtor for the use of any equipment that constitutes Centennial's collateral.

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535  ·  (561) 338-3581

WHEREFORE, Centennial Bank respectfully requests that the Bankruptcy Court:

A.    Deny the Debtor's Motions if the Court concludes that the Debtor has offered and will provide Centennial with insufficient adequate protection of Centennial's interest in cash collateral, or, in the alternative,

B.    If the Court is inclined to grant the Debtor interim relief that the Court's adequate protection order provides, at least, the following adequate protection provisions:

> a. the use of cash collateral shall be limited to only those expenses directly necessary for the maintenance of the Debtor's operations,
>
> b. cash collateral will not be used for payments of salaries to the debtor's officer insiders until a final hearing and then only as necessary,
>
> c. Centennial shall be granted senior replacement liens in all assets of the Debtor acquired post-petition, including cash collateral, to the extent of any diminution of value of Centennial's interest in the Collateral, including, but not limited to any cash collateral and equipment,
>
> d. direct the Debtor to deliver to Centennial within five (5) business day an accounts receivable aging report reflecting all currently unpaid and outstanding invoices, copies of any unpaid invoices issued to the Debtor's customer, all effective purchase orders issued to the Debtor by its customer, any agreements between the Debtor and its customer currently in effect,
>
> e. the Debtor will not be permitted to use any cash collateral for payment of any claims or amount owed to any prepetition vendors, prepetition wages, or other expenses incurred prepetition, and the Debtor is only allowed to use cash collateral in order to pay obligations arising post-petition in order to maintain

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535 ·  (561) 338-3581

the Debtor's operations, and the preserve Centennial's interest in cash collateral in accordance with the budget,

    f.   requiring the Debtor to acknowledge that it has no knowledge or notice of any claim for set off, recoupment, or otherwise, and no contra accounts exist that would materially negatively impact the value of the Debtor's cash collateral,

    g.   requiring the Debtor to acknowledge to provide monthly adequate protection payments to Centennial in an amount to be establish by the Court at the hearing, and

    h.   requiring the Debtor to deliver weekly budgets to Centennial's counsel containing information regarding the Debtor's business and financial condition on the Monday of each week until the final hearing commencing Monday, March 15, 2020, containing a variance report reflecting, on a line-item basis, the actual cash disbursements and revenues for the preceding month and the percentage variance of such actual disbursements and revenues from those reflected in the Budget for that period; and

C.    Nothing contained in any cash collateral orders entered by the Court, should preclude or estop Centennial from asserting any rights or claims Centennial has asserted or may assert against any non-debtor person or entity, and

D.    Such additional and further relief as this Court deems just and proper.


*[Remainder of page left blank intentionally]*

**ULLMAN & ULLMAN, P.A.**
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535   ·   (561) 338-3581

Respectfully submitted this 11th day of March, 2020.

ULLMAN & ULLMAN, P.A.
*Attorneys for Centennial Bank*
7700 W. Camino Real, Suite 401
Boca Raton, Florida   33433
Telephone:   (561) 338-3535
Facsimile:   (561) 338-3581


By:   */s/ Jared A. Ullman*

MICHAEL W. ULLMAN
Florida Bar No. 259667
Email:   michael.ullman@uulaw.net
JARED A. ULLMAN
Florida Bar No. 90500
Email:   jared.ullman@uulaw.net


### <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed and served electronically to all interested parties via the Court CM/ECF System, this 11th day of March, 2020.


BY:   */s/ Jared A. Ullman*

JARED A. ULLMAN
Florida Bar No. 90500
Email:   jared.ullman@uulaw.net

F:\wp51 19\190060\Pleadings\Opposition to Motion to Use CC (03-11-20).FINAL.docx

ULLMAN & ULLMAN, P.A.
7700 West Camino Real · Suite 401 · Boca Raton, Florida 33433
(561) 338-3535  ·   (561) 338-3581